UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 23 CR 323 |
| v. | |
| NIKKO D'AMBROSIO | Hon. Thomas M. Durkin |

## GOVERNMENT'S SENTENCING MEMORANDUM

The UNITED STATES OF AMERICA, by its attorney, MORRIS PASQUAL, Acting United States Attorney for the Northern District of Illinois, respectfully submits its position paper as to the factors in sentencing and asks this Court to sentence defendant Nikko D'Ambrosio to a term of imprisonment within the applicable Guideline range of 27 to 33 months' imprisonment, along with a fine within the Guideline range. Defendant defrauded the IRS, lied to law enforcement officials when confronted with the false tax filings, and then perjured himself at trial in an attempt to obstruct his prosecution. The Court's sentence must send the message to defendant and the community that such actions will be met with a serious sentence.

As discussed below, a term of imprisonment within the applicable Guideline range would be sufficient, but not greater than necessary, to satisfy the principles set forth in the Sentencing Guidelines and 18 U.S.C. § 3553(a).

1

## Procedural Background

On May 22, 2023, defendant was charged in a two-count indictment with making false statements in his personal income tax returns for the tax years 2019 and 2020.   R. 1.   A jury trial was held beginning on January 16, 2024.   On January 19, 2024, the jury returned a verdict of guilty on both counts.   R. 66, 67.

## Offense Conduct[1]

The charges stem from defendant having caused false tax returns to be filed with the IRS in 2019 and 2020.   In those tax returns, defendant, a salesman for an Illinois-based electronic sweepstakes kiosk [2] operator, MAC-T, LLC ("MAC-T") claimed to have incurred certain business expenses arising from qualifying business meals and business-related car travel and claimed deductions arising from charitable contributions.   As the evidence at trial established, defendant egregiously overstated the amount of expenses and charitable contributions on both returns.

### Relevant Tax Provisions

Pursuant to IRS rules and regulations, during the years 2019 and 2020, taxpayers could reduce their taxable income by taking deductions based on certain

---

[1] The information in this section is derived from the trial evidence and reports and other materials provided to Probation in connection with the preparation of the PSR.   At sentencing, a district court may rely upon information contained in a PSR as long as the information is well-supported and appears reliable.   *United States v. Salinas*, 365 F.3d 582, 587 (7th Cir. 2004).

[2] Sweepstakes kiosks are electronic gaming devices unregulated by Illinois law.   According to IRS Form 1099s, which the government will introduce into evidence at trial, in 2019 and 2020 defendant was a contract salesman for sweepstakes operator MAC-T.

2

business expenses and charitable contributions. For example, a taxpayer was permitted to deduct from his or her income up to 50% of the cost of qualifying business meals. *See* 26 U.S.C. § 274(n)(1). A taxpayer was also permitted to deduct from his or her income the cost of operating an automobile for business purposes by claiming the actual allowable expense amounts or by using the business standard mileage rate of "58 cents per mile for all miles of business use" in 2019, and "57.5 cents per mile for all miles of business use" in 2020. *See* IRS Notice 2019-02, *2019 Standard Mileage Rates*; IRS Notice 2020-02, *2020 Standard Mileage Rates*. A taxpayer could also deduct charitable contributions to "churches and conventions or associations of churches" to 50% of adjusted gross income. *See e.g.*, IRS Pub. 526, *2019 Charitable Contributions*.

<u>Preparation and Filing of Defendant's</u>
<u>Individual Income Tax Returns for Tax Years 2019 and 2020</u>

By way of email, defendant provided tax return information, including the above meal expenses, business mileage, and charitable contribution amounts, to his tax preparer, Sheila January-Fort. That information was compiled in a worksheet, which defendant worked on with his cousin, Nicholas Dacanay. Dacanay spoke with defendant multiple times to compile the information into the worksheet and sent defendant multiple drafts for his review.

The worksheets represented that defendant maintained "logs supporting [his] expenses (miles, meals, donations, etc.)." In an attached worksheet, defendant represented the starting and ending odometer readings for his vehicles, and that he

3

kept a detailed log reflecting his weekly contributions to St. John Cantius Church in Chicago. January-Fort took the information that defendant and Dacanay provided her, and prepared defendant's individual income tax returns. January-Fort sent draft copies of those returns to defendant by email with a cover letter that informed: "Enclosed you will find copies of your Federal and/or state income tax returns we have prepared from information you provided to us . . . We ask that you review the enclosed copies of your tax return(s) and if any questions arise, feel free to give us a call."

For each tax year, defendant completed an IRS Form 8879 (IRS e-file Signature Authorization), and January-Fort filed the tax returns at defendant's direction. In signing the Form 8879s, defendant signed under penalty of perjury that he had examined his individual income tax return and accompanying schedules and statements, and, to the best of his knowledge, they were true, correct, and complete.

<u>Defendant's 2019 Individual Income Tax Return</u>

For the 2019 tax year, defendant reported $213,185 in gross income, which was reduced by, among other items, the following claimed business expenses and tax deductions:

- A $32,094 deduction based on a claimed $64,189 spent on eligible business meal expenses;

- A $122,169 deduction based on claimed business car and truck expenses arising from 210,637 business miles driven; and

- A $26,751 deduction based on $29,775 in claimed 2019 charitable

contributions to St. John Cantius Church. This amount of charitable contributions permitted defendant to claim a tax deduction of $26,751. The limitation to the amount that could be claimed was notated in Box 14 of defendant's Schedule A, with the note "CONTRIBUTIONS LIMITED DUE TO AGI [adjusted gross income]."

These claimed deductions combined to permit defendant to reduce his 2019 taxable income by approximately $181,014. After claiming the above deductions, along with others, defendant reported a 2019 net taxable income of $4,443—approximately $208,742 less than his reported gross income.

### Defendant's 2020 Individual Income Tax Return

For the 2020 tax year, defendant claimed $334,210 in gross income and claimed similar expenses and deductions, though in greater amounts. These include:

- A $99,806 deduction based on a claimed $199,612 spent on eligible business meal expenses;

- A $152,170 car and truck expense deduction based on a claimed 264,673 business miles driven; and

- A $37,749 deduction based on $34,725 in claimed 2020 charitable contributions to St. John Cantius Church, plus $3,024 in carryover contributions from the previous year.

These claimed expenses and deductions combined to permit defendant to reduce his 2020 taxable income by approximately $289,725. After claiming the

5

above expenses and deductions, along with others, defendant reported a 2019 net taxable income of $14,874—approximately $319,336 less than his reported gross income.

### Defendant's Interview with the IRS

On January 28, 2022, defendant was interviewed, in his home, by special agents from IRS. During the interview, the IRS agents asked defendant about his 2020 tax returns and the above-described business expenses and deductions, and defendant claimed that they were correct. Defendant further informed that, in his role with MAC-T, he helped place the electronic sweepstakes kiosks into businesses, received a commission of future revenue from those kiosks, and that his income was "passive income," that is, after the kiosks were placed in certain businesses, defendant received income related to the kiosks without having to perform any further work at the businesses. Defendant justified the excessive business meal expenses, informing the agents that he "wined and dined" potential customers.

### Evidence at Trial Proved the Falsity of the Returns

At trial, the government introduced testimony from witnesses and records to prove that the expenses and charitable contribution deduction in the 2019 and 2020 tax returns were false. For example, the government introduced financial records (bank and credit card records) to prove that defendant could not possibly have spent $64,189 on business meals in 2019 or $199,612 in 2020. The government also introduced Illinois Secretary of State records, Illinois EPA records, and vehicle

6

maintenance records to establish that defendant did not drive anywhere close to 210,637 miles in 2019, or 264,673 miles in 2020 (let alone for business purposes). Testimony from the business manager at St. John Cantius Church also established that defendant was not a registered parishioner at the church in 2019 or 2020 and that there was no record of any charitable contributions from defendant in either 2019 or 2020.

Defendant's False Testimony at Trial

Rather than simply putting the government to its burden of proof, defendant elected to testify at trial, and he testified falsely. Defendant testified that Dacanay provided all of the false information in the worksheets that supported the false tax returns and that defendant neither reviewed the worksheets that he and Dacanay provided to January-Fort nor reviewed the draft tax returns that January-Fort sent to defendant. Defendant testified that he signed the Forms 8879, which contained an attestation under penalty of perjury that he had reviewed the tax return and that it was accurate, without actually having read and reviewed the draft tax return.

Defendant's testimony was belied by the record, including texts and emails between defendant and Dacanay, which reflected that Dacanay was seeking information from defendant (including odometer readings). In addition, January-Fort recalled a specific interaction with defendant in connection with his 2020 tax return where defendant told her that the business meal expenses in the draft return mistakenly included the 50% expense deduction rather than the total amount of

business meal expenses. That evidence reflected that defendant had, in fact, reviewed the false 2020 tax return, and still signed the Form 8879 attesting to its accuracy. Defendant's testimony was also belied by common sense, as the email communications and text messages between defendant and Dacanay reflected that Dacanay repeatedly messaged defendant both with changed numbers (reflecting Dacanay's receipt of information from defendant, which was incorporated into the spreadsheets) and defendant's review of the worksheets.

Finally, defendant testified that he had *one* business meal over 2019 and 2020, for which he spent $130. That evidence, whether true or not, conflicted not only with the business meal expenses in defendant's original tax returns, but also the business meal expenses in defendant's amended tax returns for 2019 and 2020, which defendant also signed under penalty of perjury. The government introduced those amended tax returns into evidence to establish the falsity of defendant's testimony.

<u>Tax Deficiency Calculations</u>

The government also introduced evidence from an IRS Revenue Agent reflecting the tax due and owing based on defendant's false statements. Those calculations (which also reflect the evidence on business meal expenses, mileage, and charitable contributions) are attached in Exhibit A to the government's version of the offense. In total, for 2019 and 2020, defendant's false tax returns led to a total federal tax due and owing of $119,198.

Evidence of Tax Fraud in 2018, Non-Filing in 2021 and 2022 (Relevant Conduct)

The evidence at trial summarized above also reflected that defendant's 2018 tax returns were false, as they included inflated meal expenses, inflated mileage figures, and false charitable contributions used to reduce defendant's taxable income. Based on IRS records, defendant did not file a tax return in 2021 or 2022. In those years, defendant made $446,532 (2021) and $424,139 (2022). *See* Ex. B to the Government's Version of the Offense. Based on a preliminary assessment of defendant's tax liability by the IRS, law enforcement understands that defendant's federal tax liability for 2018 was $22,082, for 2021 was $102,823, and for 2022 was $143,803. *Id.* at 1.

Thus, between 2018 and 2022, defendant has a total federal tax due and owing of $415,329. In addition, between 2018 and 2022, defendant has a state tax due and owing of $64,587. In total, defendant has a total tax due and owing of $479,916. *See* Ex. B to the Government's Version of the Offense.

## **Guidelines Calculation**

Offense Level Calculation

The government agrees with the Guideline calculations set forth in the PSR. Pursuant to Guideline § 2T1.1(a)(1), the base offense level is the level from Guideline § 2T4.1 (Tax Table) corresponding to the tax loss. Pursuant to Guideline § 2T1.1(c)(1), there are specific formulas for determining tax loss figures "unless a more accurate determination of the tax loss can be made." Here, the government offered

supporting materials from the IRS regarding their calculation of defendant's tax loss for the charged years as well as for two years in which defendant did not file (2021 and 2022). *See* Exhibits A and B to the Government's Version of Offense. Pursuant to application note 2 to Guideline § 2T1.1, "all conduct violating the tax laws should be considered as part of the same course of conduct or common scheme or plan unless the evidence demonstrates that the conduct is clearly unrelated." As one example, the Guidelines provide that the same course of conduct or common scheme or plan includes "a continuing pattern of violations of the tax laws by the defendant." *Id.* Accordingly, the government submits that the 2018, 2021, and 2022 tax years are properly included as part of the tax loss calculations. Using the tax table from Guideline § 2T4.1, the base offense level is 18, because the tax loss ($479,916) was more than $250,000, but less than $550,000. This is consistent with the PSR's calculation of the base offense level. *See* PSR ¶ 25.

The government concurs with Probation that an adjustment for obstruction of justice is appropriate. PSR ¶ 29. Defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the prosecution of the instant offense of conviction, and the obstructive conduct related to defendant's offense of conviction and any relevant conduct, under Guideline § 3C1.1. That obstructive conduct was defendant's false testimony, under oath, at trial. Under application note 4(B), an example of covered conduct to which the adjustment applies is committing perjury if such perjury pertains to conduct that

forms the basis of the offense of conviction.

In this case, defendant testified, under oath, that he did not have any role in preparing the false tax returns (including by compiling information at his cousin's request), did not review the false tax returns that he caused to be filed (despite signing Forms 8879 under penalty of perjury affirming that he had reviewed the tax returns and that they were true and accurate to the best of his knowledge), and that the scheme was perpetrated exclusively by Dacanay.

Defendant's testimony was contrary to the evidence, which reflected defendant exchanging emails and text messages with Dacanay about the worksheets provided to his tax preparer, defendant providing worksheets to his tax preparer, evidence from Dacanay that defendant provided the false information contained in the spreadsheets, and evidence from January-Fort that defendant contacted her to discuss the business meal expense for the 2020 tax year. In particular, January-Fort's testimony regarding her conversation with defendant establishes that defendant reviewed both the worksheets and draft tax returns, and insisted on filing the return with a higher (and fraudulent) business meal expense. In convicting defendant, the jury necessarily found defendant's testimony to be untruthful. Accordingly, the offense level is increased by 2 levels.

Because defendant meets all of the criteria set forth in Guideline § 4C1.1, the offense level is decreased by 2 levels. *See* PSR ¶ 32.

<u>Criminal History Category Calculation</u>

The government agrees with the criminal history calculations set forth in the PSR. PSR ¶¶ 36-40. Accordingly, defendant's criminal history points equal 0 and his criminal history category is I.

<u>Advisory Guideline Range</u>

Based upon a total offense level of 18 and a criminal history category of I, defendant's Guideline range is 27 to 33 months' imprisonment.

## **The Factors Set Forth in 18 U.S.C. § 3553(a)**

Section 3553(a) requires the Court to impose a sentence that is "sufficient, but not greater than necessary," to comply with the purposes of sentencing.[3] In order to determine the sentence to impose, the court must consider the statutory factors listed in § 3553(a)(1)-(7). One of those factors is the advisory range set by the Sentencing Guidelines, and another is the Commission's policy statements. § 3553(a)(4), (a)(5). Although the Sentencing Guidelines are advisory only, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

---

[3] Those purposes are the need for the sentence "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

<u>The Nature and Circumstances of the Offense</u>

In 2020 and 2021, defendant caused his tax preparer to file false tax returns with the IRS that significantly overstated his business expenses and charitable contributions. Defendant conscripted both a family member (Dacanay) and a tax preparer (January-Fort) into the fraud on the IRS. In claiming false charitable contributions to St. John Cantius Church, defendant also involved a religious institution in his scheme.

Defendant's tax fraud was egregious, and part of a pattern of filing false tax returns once he began to earn significant income from MAC-T. After the fraud, defendant had multiple opportunities to acknowledge the error of his ways, beginning with his encounter with law enforcement in January of 2022. Instead, defendant doubled down on the lies in his tax returns. Then, at trial, defendant changed his tune, acknowledged that the returns were false, but pointed the finger at a family member who had assisted him (and other family members) with their returns for de minimis compensation (and with no incentive to falsify the returns). These were all choices by defendant that compounded the harm, and these choices warrant a sentence within the Guideline range.

<u>History and Characteristics of the Defendant</u>

Defendant is 33 years old and was born in Maywood, Illinois. PSR ¶ 50. Defendant's father had a criminal record due to convictions for participation in a narcotics conspiracy and uttering counterfeit obligations. *Id.* As a result of those convictions, defendant's father was incarcerated for a time during defendant's

childhood. *Id.* Defendant's father passed in 2020. *Id.* Despite defendant's father's incarceration, defendant was close with both of his parents. *Id.* ¶¶ 50, 52. Defendant had, and has, the support of his extended family. *Id.* ¶¶ 55, 57. Unlike many defendants whom this Court sentences, defendant had a "very happy" and "blessed" childhood where all of his financial needs were met, and his community was safe. *Id.* ¶ 52.

At trial, and as detailed in the PSR, (PSR ¶ 66), defendant introduced evidence of a challenging birth and certain childhood developmental issues. While the Court may consider these factors in assessing defendant's history and characteristics, the government submits that these factors neither caused nor truly explain defendant's criminal conduct. The government also submits that Dr. Steven Farmilant's report and testimony are of limited value to the Court (as they were to the jury), in assessing defendant's motive or capabilities. Indeed, defendant's testimony contradicted much of Dr. Familant's testimony regarding the limitations of individuals diagnosed with mild neurocognitive disorder. As the PSR notes, and as Dr. Familant acknowledged, defendant's only encounter with a mental health treatment professional occurred after he was charged in the instant case and as he prepared for trial. PSR ¶ 68.

In sum, defendant's background contains limited mitigating factors that would warrant a sentence below the applicable Guideline range.

<u>The Seriousness of the Offense, and the Need to Promote Respect for the Law, Provide Just Punishment, Afford Adequate Deterrence, and Protect the Public</u>

Tax crimes are particularly serious because our tax system is a voluntary one – relying on taxpayers to correctly report their own income and expenses to the IRS so that taxes can be accurately calculated and paid. If taxpayers lose confidence in the system and believe that everyone is not paying their fair share, voluntary compliance suffers, leaving less tax revenue to pay for all the services provided by the government – national defense, health care for the elderly, disaster relief, infrastructure, etc. "Tax crimes represent an especially damaging category of criminal offenses, which strike[ ] at the foundation of a functioning government." *United States v. Zukerman*, 897 F.3d 423, 428 (2d Cir. 2018). *Compania Gen. de Tabacos de Filipinas v. Collector of Internal Revenue*, 275 U.S. 87, 100 (1927) (Holmes, J., dissenting) ("Taxes are what we pay for civilized society . . . .").

The IRS periodically estimates the "tax gap," which is the amount of federal tax liability that is not paid voluntarily and timely – estimated to be a $668 billion difference in 2021.[4] The Department of the Treasury has explained that "[b]y far the largest contributor to the tax gap is the underreporting gap," which consists of taxpayers who "underreport income or overclaim deductions and credits on tax returns" [5] —taxpayers like defendant. Any single tax prosecution, including

---

[4]    *See*    https://www.irs.gov/newsroom/irs-updates-tax-gap-projections-for-2020-2021-projected-annual-gap-rises-to-688-billion (last visited May 15, 2024).

[5] *See* U.S. Department of the Treasury, "The American Families Plan Tax Compliance Agenda," May 2021, at 3, available at https://home.treasury.gov/system/files/136/The-

defendant's, is a very small fraction of the tax gap. However, the tax gap illustrates why criminal tax prosecutions, and their related consequences to the defendants, are necessary to encourage overall compliance.

The need for general deterrence is particularly strong for economic crimes, which are often premeditated, lucrative, and difficult for law enforcement to detect. *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it.") "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Brown*, 880 F.3d 399, 405 (7th Cir. 2019) (quotation omitted).

The Sentencing Guidelines expressly acknowledge the need for deterrence in criminal tax cases:

> The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system. . . . Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

---

American-Families-Plan-Tax-Compliance-Agenda.pdf (last visited May 15, 2024).

Guideline § 2T1 (intro. comment.).   As the Fourth Circuit has explained, "it [is] clear that the [Sentencing] Commission believes that there must be a real risk of actual incarceration for the Guidelines to have a significant deterrent effect in tax evasion cases." *United States v. Engle*, 592 F.3d 495, 502 (4th Cir. 2010).

A custodial sentence is necessary to meet the goal of general deterrence. Custodial sentences in tax prosecutions will deter others who are tempted to cheat on their tax returns, thinking there will be no significant consequence.   After all, "[w]ithout a real possibility of incarceration, there would be little incentive for a wavering would-be [tax] evader to choose the straight-and-narrow over the wayward path."   *Engle*, 592 F.3d at 502.

Specific deterrence also requires a custodial sentence.   Defendant's crime was not a one-time offense.   Defendant filed false tax returns in 2018, 2019, and 2020, and then failed to file in 2021 and 2022.   If defendant's testimony regarding the lack of meal expenses was to be credited, he also filed false amended tax returns for 2019 and 2020.   Defendant then make the conscious decisions to testify in his own behalf and lie to the jury under penalty of perjury.

A sentence within the Guideline range properly accounts for the seriousness of the offense, the need to promote respect for the law, and both specific and general deterrence.

<u>Avoiding Unwarranted Sentencing Disparities</u>

Under Section 3553(a)(6), one of the factors the Court is to consider in imposing a sentence is "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." Here, the government seeks a sentence with the Guideline range and the imposition of a sentence within the Guideline range is presumptively non-disparate. "Sentencing disparities are at their ebb when the Guidelines are followed, for the ranges are themselves designed to treat similar offenders similarly." *United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006). "Challenging a within-range sentence as disparate is a 'pointless' exercise." *United States v. Chapman*, 694 F.3d 908, 916 (7th Cir. 2012). From the Seventh Circuit's perspective, "an argument that a district court did not adequately consider unwarranted sentencing disparities when giving a within-guidelines sentence may therefore be passed over in silence." *United States v. Sanchez*, 989 F.3d 523, 541 (7th Cir. 2021) (internal quotation marks omitted).[6]

**Restitution, Fine, and Costs or Prosecution**

The evidence established that defendant owes restitution in the amount of $146,621 to the IRS, and $19,721 to the Illinois Department of Revenue. On April

---

[6] To the extent the Court imposes a custodial sentence that is below the applicable Guideline range, categorically, "a below-Guidelines sentence like [the defendant's] cannot stem from an unwarranted disparity." *United States v. Baldwin*, No. 22-1835, 2023 WL 3712696, at *3 (7th Cir. May 30, 2023) (affirming sentence where both defendants received below-Guidelines sentences and finding "[t]hat [the co-defendant] also received a below-Guidelines sentence is irrelevant to the procedural soundness of [the defendant's] sentence").

30, 2024, defendant filed a motion to pay restitution before sentencing, (R. 77), which the Court granted, (R. 79).   To the extent there is any outstanding

With regard to a fine, Guideline § 5E1.2 provides: "[t]he district court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay a fine."   *See United States v. Bauer*, 129 F.3d 962, 964 (7th Cir. 1997) (defendant bears the burden of proving he lacks the financial means to pay a fine).   Pursuant to 18 U.S.C. § 3571(b), the maximum fine is $250,000.   Pursuant to Guideline § 5E1.2(c)(3), the fine range for the offense is $10,000 to $100,000.

Here, the available evidence tends to show that defendant can easily pay a fine within the Guideline range.   After summarizing defendant's assets, the PSR observes that defendant has a positive net worth of approximately $1 million, and a positive monthly cash flow in excess of $25,000.   PSR ¶ 97.   Probation thus concludes that defendant has the financial ability to pay a fine, in addition to the restitution and costs of prosecution.   *Id.*

Pursuant to 26 U.S.C. § 7206, defendant shall be ordered to pay the costs of prosecution.   In this case, the government incurred costs under the Financial Right to Privacy Act.   The government also facilitated the travel of a potential witness and paid witness fees.   At sentencing, the government will provide a total figure reflecting the costs of prosecution.

19

**Supervised Release**

Consistent with the Seventh Circuit's guidance in *United States v. Thompson*, 777 F.3d 368 (7th Cir. 2015), the government agrees with Probation that the Court should impose of a term of supervised release of 1 year. In order to promote the sentencing objectives of deterring recidivism, protecting the public, and assisting in defendant's rehabilitation and reintegration into society, the government supports Probation's recommendation that the term of supervised release include the conditions set forth below.

a. Mandatory Conditions of Supervised Release

The government agrees that the following mandatory conditions of supervised release proposed by the Probation Department should be imposed because they are required by 18 U.S.C. § 3583(a) and recommended by Guideline § 5D1.3(a):

- defendant shall not commit another federal, state, or local crime during the term of supervised release (Mandatory Condition 1);

- defendant shall not unlawfully possess a controlled substance (Mandatory Condition 2); and

- defendant shall cooperate in the collection of a DNA sample if the collection of such a sample is required by law (Mandatory Condition 5).

b. Discretionary Conditions of Supervised Release

The government agrees that the following discretionary conditions of supervised release proposed by the Probation Department should be imposed, as such discretionary conditions will serve to facilitate supervision by the Probation officer, support defendant's rehabilitation and reintegration into society, and serve to

20

promote deterrence and protect the public, and are thus appropriate in this case. The government also submits that Discretionary Condition 8 should be imposed to protect the public. Such discretionary conditions are:

- defendant shall seek, and work conscientiously at, lawful employment or, if defendant is not gainfully employed, shall conscientiously pursue a course of study or vocational training that will equip defendant for employment (Discretionary Condition 4);

- defendant shall refrain from knowingly meeting or communicating with any person whom he knows to be engaged, or is planning to be engaged, in criminal activity (Discretionary Condition 6);

- defendant shall refrain from excessive use of alcohol (Discretionary Condition 7);

- defendant shall not possess a firearm, destructive device, or other dangerous weapon (Discretionary Condition 8);

- defendant shall work in community service for 100 hours as directed by a probation officer (Discretionary Condition 12);

- defendant shall refrain from knowingly leaving the federal judicial district where he is being supervised, unless granted permission to leave by the Court or a probation officer (Discretionary Condition 14);

- defendant shall report to a probation officer as directed by the Court or a probation officer (Discretionary Condition 15);

- defendant shall permit a probation officer to visit him at any reasonable time at home, at school, at a community service location, or at any other reasonable location specified by a probation officer and permit confiscation of any contraband observed in plain view of the probation officer (Discretionary Condition 16);

- defendant shall notify a probation officer promptly, within 72 hours, of any change in residence, employer, or workplace, and absent constitutional or other legal privilege, answer inquiries by a probation officer (Discretionary Condition 17);

- defendant shall notify a probation officer promptly, within 72 hours, if arrested or questioned by a law enforcement officer (Discretionary Condition 18); and

- defendant shall satisfy other special conditions (Discretionary Condition 22).

    c. <u>Special Conditions of Supervised Release</u>

The government agrees with the special conditions of supervised release proposed by the Probation Department in the PSR, which further support defendant's reintegration into society. Specifically:

- defendant shall, if unemployed after the first 60 days of supervision, or if unemployed for 60 days after termination or lay-off from employment, perform at least 20 hours of community service per week at the direction of the U.S. Probation Office until gainfully employed. The amount of community service shall not exceed 300 hours (Special Condition 3);

- defendant shall not incur new credit charges or open additional lines of credit without the approval of a probation officer unless he is in compliance with the financial obligations imposed by the judgment (Special Condition 5);

- defendant shall provide a probation officer with access to any requested financial information necessary to monitor compliance with conditions of supervised release (Special Condition 6);

- within 72 hours of any significant change in defendant's economic circumstances that might affect defendant's ability to pay restitution, fines, or special assessments, defendant must notify the probation officer of the change (Special Condition 7);

- defendant must file accurate income tax returns and pay all taxes, interest, and penalties as required by law (Special Condition 8);

- defendant shall pay to the Clerk of the Court any financial obligation ordered herein that remains unpaid at the commencement of the term of supervised release, at a rate of not less than 10% of the total of defendant's gross earnings minus federal and state income tax withholdings (Special Condition 10);

- defendant shall not enter into any agreement to act as an informer or special agent of a law enforcement agency without the permission of the Court (Special

22

Condition 11);

- if the probation officer determines that defendant poses a risk to another person (including an organization or members of the community), the probation officer may require defendant to tell the person about the risk, and defendant must comply with that instruction (Special Condition 13); and

- defendant shall repay the IRS $146,621, representing a federal tax loss and the Illinois Department of Revenue $19,721, representing a state tax loss (Special Condition 15).[7]

## <u>Conclusion</u>

For the foregoing reasons, the United States requests that the Court sentence defendant Nikko D'Ambrosio as stated above.

Respectfully submitted,

MORRIS PASQUAL
Acting United States Attorney

By:    <u>*/s/ Richard M. Rothblatt*</u>
RICHARD M. ROTHBLATT
BRANDON D. STONE
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 353-5300

Dated: May 15, 2024

---

[7] This amount should be reduced by the amount defendant pre-paid in restitution.

## CERTIFICATE OF SERVICE

I, Richard Michael Rothblatt, hereby certify that on May 15, 2024, I electronically filed the foregoing **GOVERNMENT'S SENTENCING MEMORANDUM** with the Clerk of the Court for the United States District Court for the Northern District of Illinois by using the Case Management/Electronic Case Files (CM/ECF) system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

> By: */s/ Richard M. Rothblatt*
> Richard M. Rothblatt
> Assistant United States Attorney
> 219 S. Dearborn Street, Rm. 500
> Chicago, Illinois 60604
> (312) 353-5300